IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-41103

CAB-95-39

NOE BELTRAN,

Petitioner-Appellee/Cross-Appellant,

versus

JANIE COCKRELL, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellant/Cross-Appellee.

U.S. COURT OF APPEALS
FILED
JUN 2 7 2002
CHARLES R. FULBRUGE III
CLERK

United States District Court
Southern District of Texas
FILED
AUG 0 7 2002
Michael N. Milby
Clerk of Court

Appeals from the United States District Court
For the Southern District of Texas

Before HIGGINBOTHAM and CLEMENT, Circuit Judges.*

CLEMENT, Circuit Judge:

Petitioner-appellee Noe Beltran challenges the district court's denial of his ineffective assistance of counsel claim. Respondent-appellant challenges the district court's grant of petitioner's habeas petition on the grounds that the prosecution knowingly failed to correct false testimony. We grant habeas relief, but rest the affirmation on Beltran's ineffective

---

* Judge Politz was a member of the panel that heard oral arguments. However, due to his death on May 25, 2002, he did not participate in this decision. This case is being decided by a quorum pursuant to 28 U.S.C. § 46(d) (1996).

1

assistance of counsel claim. The prosecution skirted a line from which it should steer clear in the future. However, because we grant the petition on ineffective assistance of counsel grounds, we do not have to affirm the false testimony claim. The latter is potentially complicated here by a dispute over whether or not the prosecution believed that the concerned testimony was false and the defense counsel's repeated objections to the prosecution's attempts to admit the photo spread central to the claims and to mention Beltran's co-defendant.

## I. FACTS AND PROCEEDINGS

### A. *Facts*

On the afternoon of March 4, 1981, a murder and robbery occurred at the Disco de Oro Tortilla Factory in Brownsville, TX. Owners and operators Enrique and Carmen Arechiga, their seventeen-year-old son Valentin, and employees Guadalupe Benavides and Maria Ybarra were in the tortillaria at the time of the incident. Upon entering, the robber pointed a derringer pistol owned by Beltran's co-defendant Ruben Plata at Valentin, who was standing near the cash register. Valentin immediately gave the intruder an unspecified amount of money. Carmen approached the register. While she was handing over more money, the robber fired the derringer, killing her. Fleeing the scene, the robber jumped into the passenger side of a red sports car, also owned by Plata, that had pulled into the adjacent alley right before the robbery.

2

Neighbor Guadalupe Rodriguez testified that after hearing a noise from the tortillaria she looked out of her window and saw the intruder leave the tortillaria and run towards the sports car. After the murder, Valentin and Benavides ran into the alley and saw the red sports car. Valentin had also seen the sports car pull into the alley right before the intruder entered the tortillaria. Valentin drove around with the police right after the robbery-murder; they found the car outside of Plata's apartment. Police officers determined that Plata owned the car.

On the day of the incident, the police made a composite drawing of the assailant with a tattoo of the initials "LX" or "LT" on his upper left arm and forearm. The police also compiled a photo spread including a picture of Plata, which they showed to Valentin, Benavides, and Ybarra that same day. This photo spread, State's Exhibit 10, was never admitted at trial. Valentin chose Plata in the photo spread but qualified his choice by stating that he could not make a definite identification without seeing a better picture of Plata. When he was later shown a spread without a photo of Plata, Valentin requested to see Plata's photo again, stating that it was the only one that resembled the robber. Benavides thought Plata looked like the robber but was not certain; he stated that the robber had longer hair than Plata did in the photo and that he would like to see a more recent photo of Plata. Ybarra's response to the photo spread was similar to that of Benavides.

Then-District Attorney Reynaldo Cantu prepared an affidavit requesting a warrant to arrest Plata and his brother Luis Plata and to search the car. Evidence supporting probable cause was that four hours before the murder Plata committed an aggravated assault with a derringer at a motel, the murder weapon was a derringer, three witnesses tentatively identified Plata as the murderer, Plata's car left the scene of the crime, and the Plata brothers were seen together in the car fifteen minutes after the murder. Officer Victor Rodriguez swore to the affidavit on March 4, 1981.

Several days later a photo spread was compiled with Beltran's photo. Enrique, Valentin, Benavides, and Guadalupe Rodriguez all identified Beltran in the photo spread. Beltran was arrested on March 14, 1981. Enrique, Valentin, and Benavides identified Beltran in lineups on the day of his arrest. Enrique, Valentin, and Benavides also made in-court identifications of Beltran as the robber. They all testified to previously identifying appellant in a photo spread and picking him out of a lineup conducted on March 14, 1981. Valentin testified outside of the presence of the jury that the assailant was not in the March 4 photo spread. Before the jury Valentin testified that Beltran was the assailant and that he had previously identified Beltran in the only photo spread that he saw and in a lineup. Enrique admitted that he could not make a positive identification when he initially viewed Beltran in the lineup. Guadalupe Rodriguez tentatively identified Beltran in

4

court explaining that she had only seen the assailant from the side.

At trial, Officer Rodriguez testified for the prosecution that the photo spread with Plata's picture, State's Exhibit 10, was compiled on the day of the robbery-murder to try to identify the assailant. When asked: "Were you able to get an identification on the person in that robbery?", Rodriguez replied, "No, sir." The government then asked: "Did you know the name of the suspect placed in that spread for them to identify?" Lead defense counsel objected to this question on relevancy grounds even though he knew that witnesses had tentatively identified Plata in that spread. The prosecution then tried to introduce into evidence State's Exhibit 10, but lead defense counsel again objected on relevancy grounds. The prosecution's reply to the objection was: "a defensive issue is always, 'Could it have been the other guy?' The state will show . . . the investigative procedure that the police used to identify the person that committed the murder and to exclude people that could not be identified as having committed the murder." Defense counsel's response was: "Your Honor, we could be here forever excluding people that didn't do it."

Admitting the tentative identifications of Plata was further discussed outside of the presence of the jury. Defense counsel vehemently objected several times to the relevancy of questioning Officer Rodriguez about the tentative identifications. The

prosecution stated that the discussion was necessary to determine whether Plata or Beltran killed the woman. Defense counsel asserted that the court should "not care what kind of characteristics are shown by photographs of Ruben Plata."

The state's theory at trial was that Beltran committed the murder and Plata drove the getaway car. The state's case depended solely on eyewitness identifications; there was no physical evidence to connect Beltran to the crime.

### B. Proceedings

Beltran was arrested on March 14, 1981, and charged with capital murder. A Texas district court jury found Beltran guilty of capital murder on August 19, 1981, and the court sentenced Beltran to death. The Texas Court of Criminal Appeals affirmed Beltran's conviction but reformed his sentence to life imprisonment. Beltran's state writ of habeas corpus was denied on October 5, 1994.

On March 7, 1995, Beltran filed a federal habeas petition under 28 U.S.C. § 2254. An evidentiary hearing was held and final judgment granting habeas relief was entered on January 4, 1999. The court then granted a 59(e) motion by the director. After a second evidentiary hearing in front of a magistrate judge, the district court adopted the report and recommendations of the magistrate and entered an order on September 15, 2000, granting relief on the grounds that the state failed to correct false

testimony and denying relief on the ineffective assistance of counsel claim. The director filed a timely notice of appeal, and Beltran cross-appealed to pursue his ineffective assistance claim. Beltran's April 2001 motion to issue a certificate of probable cause is rendered moot by our decision to grant habeas relief on his ineffective assistance of counsel claim.

## II. ANALYSIS

### A. *Standard of Review*

Since Beltran filed his habeas petition prior to the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), it does not fall under AEDPA standards. See Green v. Johnson, 160 F.3d 1029, 1035 (5th Cir. 1998). We review the federal district court's findings of fact for clear error. See Fairman v. Anderson, 188 F.3d 635, 640 (5th Cir. 1999). The district court's conclusions of law and of mixed law and fact are reviewed de novo. See id.; Nobles v. Johnson, 127 F.3d 409, 423 (5th Cir. 1997). As mixed questions of law and fact, Beltran's claims of uncorrected false testimony and ineffective assistance of counsel are reviewed de novo. See Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998); Crane v. Johnson, 178 F.3d 309, 312 (5th Cir. 1999).

### B. *Ineffective Assistance of Counsel*

Strickland v. Washington, 466 U.S. 668 (1984), set the standard for a finding of ineffective assistance of counsel. A habeas petitioner must "demonstrate both that counsel's performance

was deficient and that the deficiency prejudiced the defense." Crane, 178 F.3d at 312 (citing Strickland, 466 U.S. at 687).

The district court adopted the magistrate's report and recommendations denying Beltran's ineffective assistance of counsel claim because of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Crane, 178 F.3d at 312. The district court ruled that counsel made a reasonable strategic decision not to impeach Valentin and Benavides and to refrain from objecting to the misleading testimony. We disagree with the conclusion that counsel's relevant strategic choices could have been reasonably made "after thorough investigation of law and facts relevant to plausible options." Strickland, 466 U.S. at 690.

The defense strategy was to show that Beltran did not have the "LX" or "LT" tattoo shown in the composite sketch made on the day of the incident. All defense counsel did to further this strategy was testify to Beltran's lack of such a tattoo,[1] despite other easily discoverable relevant evidence with significant exculpatory value. Specifically, defense counsel failed to introduce evidence that witnesses had tentatively identified Plata and that Plata had

---

[1] "Appellant's attorney testified that he had been appointed by the court to represent the appellant. He identified two photographs taken of appellant's left arm showing the absence of the tattooed initials 'LX' or 'LT,' which were supposed to have been on the assailant's upper left forearm according to a composite received into evidence. Defense counsel was the only witness called by the defense before both sides closed." Beltran v. State, 728 S.W.2d 382, 385 (Tex. Crim. App. 1987).

8

such a tattoo. At trial, defense counsel knew that Valentin, Benavides, and Ybarra had tentatively identified Plata. However, defense counsel was not aware that Plata had the tattoo central to the defense strategy nor that Ruben and Luis Plata had been seen together in the getaway car fifteen minutes after the murder.

Defense counsel never investigated whether Plata had any tattoos. A presentence investigation report prepared in 1978 on Plata in an unrelated robbery case in Brownsville described him as having eight different tattoos, including a Nazi cross on his upper left arm that witnesses could easily have mistaken for an "LX" or "LT." A responsible investigation of Plata would have uncovered the tattoo as well as the fact that he and his brother had been spotted in the getaway car shortly after the shooting. Defense counsel's assertion that the court should "not care what kind of characteristics are shown by photographs of Ruben Plata" was obviously wrong. In fact, lead defense counsel admitted that he would have impeached the witnesses if he had known that Plata had the tattoo.

Even without knowledge of Plata's tattoo, it was unreasonable for defense counsel not to use the tentative identifications to impeach the witnesses and to object repeatedly to introduction of the photo spread.[2] In the second federal evidentiary hearing on

---

[2] The court conducted a hearing outside of the presence of the jury to determine the admissibility of the pretrial identifications of Beltran. When the government asked Detective William Kingsbury about the March 4 photo spread,

9

the habeas petition, lead defense counsel testified that he deliberately tried to keep the jury from hearing anything about Plata because he did not want Beltran associated with Plata, whom he thought resembled a serial killer.[3] However, the tentative identifications had significant exculpatory value. Co-counsel for the defense acknowledged that he would have impeached the witnesses if he had conducted the cross-examination. This is not a matter of this court merely disagreeing with counsel's trial strategy. See Crane, 178 F.3d at 312.

To satisfy the second prong of the Strickland test, petitioner must show prejudice. Id. There was prejudice here; the fact that Beltran's co-defendant had such a tattoo and had been tentatively identified by witnesses would have raised sufficient doubt in the jury. Defense counsel's unreasonable strategic decisions and investigative failures amounted to ineffective assistance of counsel.

### C. False Testimony

"The Due Process Clause of the Fourteenth Amendment forbids the State from knowingly using perjured testimony." Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000) (citing Giglio v. United States, 405 U.S. 150, 153 (1972)). To grant habeas on false

---

defense counsel objected on relevancy grounds.

[3] Plata shaved his head during the time of Beltran's trial, making the "6-6-6" tattoo on his forehead prominent.

10

testimony grounds, petitioner must show that "(1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false." Nobles, 127 F.3d at 415. Petitioner has shown (1) and (2). It is not clear that Beltran has satisfied prong three; regardless, defendant most likely waived any error.

The alleged false testimony includes witness testimony that Beltran was the only person identified as the assailant. This testimony was bolstered by the prosecution's summation, which included statements that witnesses consistently identified only Beltran. The prosecution never clarified the witnesses testimony by bringing out the tentative identifications of Plata, perhaps because the defense objected to the most likely avenues of such clarification. Namely, the defense repeatedly objected to mention of the suspect in the first photo spread, questioning Officer Rodriguez concerning the tentative identifications, and admission of the photo spread.

The government argues that it did not know the testimony was false because a tentative identification is different from an identification,[4] and Plata was only tentatively identified in the first photo spread. The government relies on United States v. Bean, which held that the admission of a photo identification of a defendant based upon a tentative identification and without an

---

[4] At the writ hearing, Officer Rodriquez testified that a tentative identification is not an identification.

11

accompanying in-court identification was erroneously prejudicial and should not be discussed in front of the jury. 443 F.2d 17, 18 (5th Cir. 1971). <u>Bean</u> did not hold that a tentative identification is tantamount to no identification or that a tentative identification cannot be used to impeach a witness who makes an identification at trial. "It is a basic rule of evidence that witnesses need not assert that they are certain of their identification beyond a reasonable doubt." <u>United States v. Roberts</u>, 481 F.2d 892, 893 (5th Cir. 1973).

The government should not have relied on <u>Bean</u> as a rationalization for the misleading testimony. However, the government was consistent in distinguishing tentative identifications from identifications across Beltran and Plata's separate trials[5] and may have sincerely believed there was a difference that saved the testimony from being false. Because, if we were to rule on the false testimony claim, we would base our decision on Beltran's waiver of the errors, we do not have to explore the government's credibility on this point. Besides, even

---

[5] The government was consistent in the position that a tentative identification is not an identification in both the Plata and Beltran trials, even though it did not help them to take that position in the Plata trial. At the pretrial in Plata's case, Officer Rodriguez stated that Valentin and Benavides did not identify Plata in the photo spread: "He was merely picked out as a subject representing somebody that looked like the actor. The photo was an old photo and was not a very true photo. They could not make an identification from there." At Plata's trial, Officer Kingsbury testified that he received neither a positive nor a tentative identification of Plata from some of the witnesses. Valentin also testified at Plata's trial that he did not identify Plata. Officer Lupe Limas testified at Plata's trial that Plata was never identified as being at the scene.

12

if the government's theory was acceptable, it would not apply to Valentin's answer that he identified Beltran in the only photo spread that he saw.

"[T]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object." DeMarco v. United States, 928 F.2d 1074, 1076 (11th Cir. 1991). "In Decker, we held that the Government can discharge its responsibility under Napue and Giglio to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible." United States v. Barham, 595 F.2d 231, 243 n. 17 (5th Cir. 1979) (citing United States v. Decker, 543 F.2d 1102, 1105 (5th Cir. 1976) ("we hold that the Government fulfilled its duty of disclosure by supplying appellants with its recollection of the true circumstances of the negotiations with the witnesses at a time when recall and further exploration of these matters was still possible.")) (referring to Napue v. Illinois, 360 U.S. 264 (1959); Giglio, 405 U.S. 150). An oft-cited Seventh Circuit case states:

> "the fact that the alleged statement was known to petitioner and his counsel during the trial compelled petitioner to raise this issue then or not at all. When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must impeach the testimony at the trial, and 'cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding.'" Evans v. United States, 408 F.2d 369, 370 (7th Cir. 1969)

(quoting Green v. United States, 256 F.2d 483, 484 (1st Cir. 1958)).

Defense counsel knew about the tentative identifications at trial. Thus, Beltran waived his right to object to the false testimony by failing to use the tentative identifications to impeach the witnesses and by repeatedly objecting not only to admission of the photo spread but also to mention of Ruben Plata. These failures were part of a deliberate defense strategy. Defense counsel was aware that the testimony was misleading but consciously decided not to clarify for the jury. See Ross v. Heyne, 638 F.2d 979, 986 (7th Cir. 1980).

Beltran argues that the state's use of the error during summation nullifies waiver. In summation, the government stated that witnesses consistently identified Beltran in photo spreads and lineups and that the defense could not show any "variations" in the identifications. "[T]he Government not only permitted false testimony of one of its witnesses to go to the jury, but argued it as a relevant matter for the jury to consider." United States v. Sanfilippo, 564 F.2d 176, 179 (5th Cir. 1977).

In Sanfilippo, in which the government also used false testimony in summation, the defense tried numerous times during the trial to elicit evidence that the testimony was false but failed. 564 F.2d at 177. Only the government knew that the testimony was false when it allowed it to stand uncorrected and relied on it in summation. The Sanfilippo court did not deal with the situation

14

presented here, where the prosecution used the false testimony consciously allowed by the defense as part of a legal strategy.

Barham is another Fifth Circuit case in which the prosecution compounded the deception, in that instance with misleading questions by the prosecution. Like Sanfilippo, Barham is distinguishable; defense counsel was ignorant at trial that the relevant testimony was false. 595 F.2d at 243 n. 17. The Barham court noted that "[w]ere this truly a case involving simply the failure of both sides to correct material false evidence the defense because it had not thoroughly familiarized itself with discovery documents in its possession, and the prosecution because it erroneously, but nonetheless reasonably assumed defense counsel knew the evidence was false and was consciously choosing to let it go unimpeached we would hesitate to reverse." Id.

Beltran's defense counsel not only knew that the relevant testimony was misleading but deliberately chose not to impeach that testimony and even went so far as to object to lines of questioning and attempted admissions by the government that could have led to disclosure of the tentative identifications of Plata. Defense counsel's consistent attempts to keep any mention of Plata from the jury indicates waiver of the false testimony claim. However, since we grant habeas relief on the ineffective assistance of counsel claim, we do not have to resolve whether Beltran waived objection to the government's use of misleading testimony in summation.

## III. CONCLUSION

For the foregoing reasons, the district court's denial of habeas on ineffective assistance of counsel grounds is REVERSED and the grant of habeas on the grounds that the prosecution failed to correct false testimony is REVERSED.